```
 1                 UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3

 4
    UNITED STATES OF AMERICA         )
 5                                   ) DOCKET NUMBER
                                     ) 1:17-MJ-492-RGV-1
 6                                   )
             V                       )
 7                                   ) ATLANTA, GEORGIA
                                     ) JUNE 19, 2017
 8                                   )
    CATHINE SELLERS                  )
 9                                   )

10
                  TRANSCRIPT OF DETENTION HEARING
11          BEFORE THE HONORABLE RUSSELL G. VINEYARD
                  UNITED STATES MAGISTRATE JUDGE
12

13
    APPEARANCES OF COUNSEL:
14

15     FOR THE GOVERNMENT:      MR. JOHN DEGENOVA

16     FOR THE DEFENDANT:       MR. PAUL ROMAN

17     COURT REPORTER:          ALICIA BAGLEY, RMR, CRR

18

19        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
                 TRANSCRIPT PRODUCED BY COMPUTER
20

21

22

23

24

25
```

1                           I N D E X

2

3

   FOR THE GOVERNMENT:
4
       SHEREZAD DUNN
5
           Direct Examination - Mr. DeGenova          5
6          Cross-Examination - Mr. Roman               19
           Redirect Examination - Mr. DeGenova         23
7          Recross-Examination - Mr. Roman             24

8

9  FOR THE DEFENDANT:

10     JUSTIN CLUTTER

11          Direct Examination - Mr. Roman              25
           Cross-Examination - Mr. DeGenova            30
12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2        [In Atlanta, Fulton County, Georgia; June 19, 2017;

3              in open court; defendant present.]

4        THE COURT:  Please be seated.

5             This is the case of the United States of America

6   vs. Cathine Sellers, Case Number 1:17-MJ-492.  This is the

7   time the Court has set down for a preliminary hearing and

8   detention hearing in this case.  We have Mr. DeGenova on

9   behalf of the United States and Mr. Wilmot.  On behalf of

10  Ms. Sellers is Mr. Roman.

11        MR. ROMAN:  Yes, sir.

12        THE COURT:  I have -- you filed what's described

13  as a limited notice of appearance of counsel, limited

14  appearance for detention hearing only.  Mr. Roman,

15  generally I do not allow a limited appearance.  If you're

16  in the case, you're in the case or you're not.

17        MR. ROMAN:  Right.

18        THE COURT:  So tell me what your status is.

19        MR. ROMAN:  Your Honor, I ask the Court's leave

20  for just a couple days.  I saw my client for the first

21  time on Saturday, she got shipped down to Lovejoy.  As you

22  know, that's, you know, a little bit of a trip.  I got

23  busy on Friday so I couldn't see her then.  Her mom and

24  her dad are in town, I'm going to speak with them and I

25  should be able to let the Court know in a couple days.

1            THE COURT:  Okay.  Well, you're entitled to have

2   two additional days to prepare for the hearing and conduct

3   the hearing.  Is that what you'd like to do, then, is

4   continue this over until Wednesday?

5            MR. ROMAN:  No, no, no.  I'd like to go forward

6   today on this hearing.  But as for the case itself, I'd

7   like to advise the Court, if I could have a couple days.

8            THE COURT:  Well, the problem is if you're in

9   the case, you're in the case, and I want you to have

10   adequate time to realize whether you are or not.  I know

11   you need to make those arrangements and I'll give you time

12   to do that.

13            Does the government maintain the detention

14   motion, Mr. DeGenova?

15            MR. DeGENOVA:  Yes, Your Honor, it does.

16            THE COURT:  Okay.

17            MR. ROMAN:  Your Honor, we're ready to go

18   forward today.  I'm in the case.

19            THE COURT:  Okay.  All right.  For the detention

20   and the preliminary hearing, is that what you all both

21   want to proceed on this morning?

22            MR. DeGENOVA:  Yes, Your Honor.

23            MR. ROMAN:  Yes, Your Honor.

24            THE COURT:  Okay.  All right.  So you're in the

25   case, Mr. Roman, and we'll move forward then.

1          MR. ROMAN:  Thank you.

2          THE COURT:  All right.  Mr. DeGenova, call your

3  witness.

4          MR. DeGENOVA:  Your Honor, if allowed, I'd like

5  to go ahead and ask the witness some questions that relate

6  to the detention issue, as well as the preliminary issue.

7          THE COURT:  Yeah, cover both since we're going

8  to proceed on both.  Who's your witness?

9          MR. DeGENOVA:  Of course.  The government calls

10  Agent Sherezad Dunn.

11          THE COURT:  Come forward.  Step into the witness

12  box for us, please.

13          THE CLERK:  Raise your right hand.

14              [the witness was sworn]

15          THE CLERK:  Please be seated and state and spell

16  your name for the record.

17          THE WITNESS:  My first name is Sherezad,

18  S-H-E-R-E-Z-A-D.  Last name is Dunn, D-U-N-N.

19          THE COURT:  You may proceed.

20                DIRECT EXAMINATION

21  BY MR. DEGENOVA:

22  Q.    Good morning, Agent Dunn.

23  A.    Good morning.

24  Q.    Agent Dunn, could you tell us how you're employed.

25  A.    I'm a special agent with the Drug Enforcement

1  Administration.

2  Q.    And how long have you been a special agent with the

3  Drug Enforcement Administration?

4  A.    For approximately one year.

5  Q.    Before that how were you employed?

6  A.    I was a police officer with the City of East Point

7  Police Department and a task force officer with DEA since

8  2011.

9  Q.    And as a DEA special agent what are your duties and

10 responsibilities?

11 A.    Investigate federal-level drug trafficking.

12 Q.    Okay.  Are you familiar with a case involving a

13 Cathine Sellers?

14 A.    Yes.

15 Q.    How are you familiar with that case?

16 A.    We executed a search warrant and conducted a

17 controlled buy from Ms. Sellers on Tuesday of last week.

18 Q.    Do you see Ms. Sellers in the courtroom today?

19 A.    I do.

20 Q.    Could you please identify her for the Court.

21 A.    Orange jumpsuit at defense table.

22 Q.    Thank you, Agent Dunn.

23         MR. DeGENOVA:  Permission to approach, Your

24 Honor.

25         THE COURT:  You may.

1  BY MR. DEGENOVA:

2  Q.    Agent Dunn, I've handed you what's been marked as

3  Government Exhibit 1.  Agent Dunn, do you recognize the

4  document sitting before you?

5  A.    Yes.  It's the affidavit [inaudible].

6  Q.    When was the affidavit filled out?

7  A.    June 14th.

8  Q.    And is that the affidavit in this case against

9  Ms. Sellers?

10  A.    It is.

11  Q.    Is the affidavit true and correct to the best of

12  your knowledge?

13  A.    Yes.

14  Q.    And is there anything since then that you found that

15  you need to update or any other information about the

16  affidavit you need to fix?

17  A.    No.

18        MR. DeGENOVA:  The government moves to admit

19  Government's Exhibit Number 1.

20        MR. ROMAN:  That's fine, Judge, no objection.

21        THE COURT:  It's admitted without objection.

22  BY MR. DEGENOVA:

23  Q.    Okay.  Agent Dunn, I'd like to ask you a few

24  questions about the controlled purchase that you mentioned.

25  Where -- or could you just go ahead and give us the

1  background for that controlled purchase.

2  A.    On Tuesday of last week a confidential source went

3  to Ms. Sellers' residence located at 101 Weatherburne

4  Drive in Roswell and purchased approximately 100 pills of

5  fentanyl.

6  Q.    Did the agent meet -- or did the CS, excuse me, meet

7  with agents beforehand?

8  A.    He did.

9  Q.    And afterwards as well?

10  A.    Yes.

11  Q.    And did agents search the CS beforehand and

12  afterwards?

13  A.    Yes.

14  Q.    Did agents find any controlled substances or other

15  contraband?

16  A.    No.

17  Q.    Did agents provide the CS with government funds in

18  advance?

19  A.    Yes.

20  Q.    Approximately how much?

21  A.    $1400.

22  Q.    Is that the amount of money that the CS paid for the

23  fentanyl pills you mentioned?

24  A.    Yes.

25  Q.    Do you know what the fentanyl pills -- or, excuse

1   me, the pills that the CS purchased looked like?

2   A.    They looked like small, blue Roxy 30 pills.

3   Q.    What are Roxy 30 pills?

4   A.    A Controlled II narcotic usually used for pain.

5   Q.    Okay.  So they looked like a normal prescription

6   pain pill?

7   A.    Yes.

8   Q.    Okay.  And you said there were how many pills,

9   approximately?

10  A.    100.

11  Q.    Okay.  Were the pills field tested?

12  A.    They were.

13  Q.    And what did the test show?

14  A.    It came back positive for furanyl fentanyl.

15  Q.    Okay.  And what is furanyl fentanyl?

16  A.    An analog of fentanyl, which is also a controlled

17  narcotic similar to morphine but more potent.

18  Q.    More potent than morphine?

19  A.    Yes.

20        MR. DeGENOVA:  Your Honor, just continuing

21  permission to approach the witness?

22        THE COURT:  Yes, you may.

23        MR. DeGENOVA:  Thank you.

24  BY MR. DEGENOVA:

25  Q.    Agent Dunn, I'm handing you what's been marked as

1  Government's Exhibit Number 2.  Do you recognize this?

2  A.    Yes.

3  Q.    What is this?

4  A.    Those are the pills that were purchased by the CS.

5  Q.    It's a picture of the pills that were purchased by

6  the CS?

7  A.    Yes.

8  Q.    How do you recognize this picture?

9  A.    I was present when the CS returned with the bag.

10  Q.    Okay.  So this is a picture of the 100 pills that

11  you mentioned were purchased by the CS?

12  A.    Correct.

13  Q.    From Ms. Sellers?

14  A.    Yes.

15          MR. DeGENOVA:  Thank you.  The government moves

16  to admit Government's Exhibit Number 2.

17          MR. ROMAN:  No objection.

18          THE COURT:  It's admitted.

19  BY MR. DEGENOVA:

20  Q.    All right.  Before the CS had purchased the pills

21  from Ms. Sellers did the CS report to agents anything about

22  the pills that he was going to buy from Ms. Sellers?

23  A.    He did.  He saw the pills at Ms. Sellers' residence

24  and said they were fentanyl.

25  Q.    Who said that they were fentanyl?

1  A.    The CS said that he was told they were fentanyl

2  pills by Ms. Sellers.

3  Q.    All right.  Did Ms. Sellers tell the CS anything

4  else about the pills?

5  A.    That if anyone was going to take the pills they

6  should take a quarter of it because of how strong they

7  were.

8  Q.    Okay.  Did she have any knowledge about why they

9  were strong pills?

10 A.    Customers kept returning the pills because of how

11 potent they were, how strong they were.

12 Q.    When you say "customers," you mean Ms. Sellers'

13 customers?

14 A.    Correct, correct.

15 Q.    Tried to return some of the pills?

16 A.    Yes.

17 Q.    Okay.  So she -- and did she -- I think you

18 mentioned that she advised to take a quarter of the pill?

19 A.    Yes.

20 Q.    Okay.  So if the CS purchased 100 pills, then that

21 would equate to about 400 doses; is that correct?

22 A.    Yes.

23 Q.    Okay.  Did Ms. Sellers mention at any time to the CS

24 about how many pills she had?

25 A.    Approximately 1,000.

1   Q.    1,000 pills, okay.

2          I'll turn now to the point where agents arrested

3   Ms. Sellers on Tuesday, June 13th.  Did agents search

4   Ms. Sellers when they arrested her?

5   A.    They did.

6   Q.    All right.  Did they find any controlled substances?

7   A.    They did.  Inside of her purse they found a lint

8   roller which contained suspected marijuana, meth, and

9   three additional pills of the fentanyl that matched the

10  pills that were purchased by the CS.

11  Q.    To be clear, were those pills field tested for

12  fentanyl?

13  A.    They were not.

14  Q.    But did they match in type and color the pills that

15  were purchased by the CS?

16  A.    Yes.

17  Q.    Okay.  Did agents find any other contraband on

18  Ms. Sellers at the time?

19  A.    No.

20  Q.    Did agents find any firearms?

21  A.    No.

22  Q.    Do you happen to know if Ms. Sellers is licensed to

23  carry a firearm?

24  A.    She is.  She has a concealed carry permit.

25  Q.    She has a concealed carry permit?

1           Do you -- where was Ms. Sellers apprehended?

2   A.     At a gas station on 400 and Holcomb Bridge Road, I

3   believe.

4   Q.     And approximately how long after the controlled

5   purchase did this happen?

6   A.     Thirty minutes, less than 30 minutes.

7   Q.     Okay.  Did Ms. Sellers say where she was going at

8   the time?

9   A.     The Vinings area.

10  Q.     Where is Holcomb Bridge Road or Holcomb Road?

11  A.     It's in Roswell.

12  Q.     Okay.  So she said she was going from Roswell to

13  Vinings?

14  A.     Correct.

15  Q.     Okay.  I'll turn briefly now to the search warrant

16  that was executed on Ms. Sellers' residence.  Where was the

17  search warrant executed again?

18  A.     101 Weatherburne Drive, Roswell.

19  Q.     Is that in the Northern District of Georgia?

20  A.     Yes.

21  Q.     Okay.  Ms. Sellers [sic], could you give us a layout

22  of the residence, please?

23  A.     The downstairs of the townhouse a living room, a

24  kitchen, bedroom, bathroom, and upstairs was an additional

25  bedroom, bathroom, and laundry room.

1  Q.    Was anyone else in the home when agents executed the

2  search warrant?

3  A.    Yes.  Two children were present inside the house.

4  Approximately an 11 and [inaudible].

5  Q.    Are those Ms. Sellers' children?

6  A.    Yes.

7  Q.    Okay.  Was anyone else in the home?

8  A.    No.

9  Q.    Did it appear that anyone else lived in the

10 residence aside from the children and Ms. Sellers?

11 A.    Not that I could tell.

12 Q.    So whose bedrooms were downstairs?

13 A.    The children.

14 Q.    The children.  And whose bedroom's upstairs?

15 A.    Ms. Sellers'.

16 Q.    Okay.  I'll go ahead and show you a series of

17 documents.  I'm going to go ahead and show you what's

18 marked as Government's Exhibits 3, 4, and 5.

19        MR. ROMAN:  Is it possible I could see those

20 before -- sorry, go ahead.

21 BY MR. DEGENOVA:

22 Q.    Agent Dunn, do you recognize these pictures?

23 A.    Yes.

24 Q.    What are they?

25 A.    Pictures of -- Exhibit 3 is the inside of

1   Ms. Sellers' bedroom; 4 is the makeup counter inside of

2   Ms. Sellers' bedroom; and Exhibit 5 is the pill bottle

3   that contained additional suspected fentanyl pills.

4   Q.    Let's rewind there.  So were additional pills found

5   in Ms. Sellers' home?

6   A.    Yes.

7   Q.    Okay.  And where were those pills found?

8   A.    On a makeup table inside Ms. Sellers' bedroom.

9   Q.    Okay.  And how do you recognize the pictures that

10  you just described to us?

11  A.    The pictures?  I was present during part of the

12  search warrant and [inaudible].

13  Q.    Okay.  You mentioned Exhibit 3 is what again?

14  A.    Ms. Sellers' bedroom.

15  Q.    And could you point out for the Court where exactly

16  the pill bottle was found in Ms. Sellers' bedroom on that

17  picture.

18  A.    On the white makeup counter located in the back next

19  to the bed.

20  Q.    Okay.  Okay.  And is Exhibit 4 a closeup of that

21  makeup counter?

22  A.    It is.

23  Q.    Okay.  And which of the pill bottles were the

24  fentanyl pills found in?

25  A.    In the Rite-Aid lysine pill bottle.

1  Q.    And how many pills were found in that bottle?

2  A.    Approximately another 100.

3  Q.    And were they -- did they look similar to the pills

4  that were purchased by the CS?

5  A.    Yes.

6  Q.    Okay.  And what is Exhibit 5 then?

7  A.    Exhibit 5 is the pill bottle and the pills inside

8  the bottle of the suspected fentanyl.

9  Q.    The suspected fentanyl.  And to be clear, were these

10  pills also field tested?

11  A.    They were not.

12  Q.    But they looked similar?

13  A.    Correct.  Because they were fentanyl, no additional

14  tests were conducted.

15        MR. DEGENOVA:  All right.  The government moves

16  to admit Exhibits 3, 4, and 5.

17        MR. ROMAN:  No objection.

18        THE COURT:  They're admitted.

19  BY MR. DEGENOVA:

20  Q.    You mentioned the pills were found in a Rite-Aid

21  bottle.  Do you know what kind of bottle the pills were in

22  specifically?

23  A.    Lysine, which is a dietary supplement.

24  Q.    Okay.  So they weren't labeled as a controlled

25  substance or a painkiller or anything like that?

1    A.    No.

2    Q.    Okay.  Were the pills -- the pill bottle was just

3    sitting on the makeup counter?

4    A.    Yes.

5    Q.    Okay.  So could anyone have access to the pill

6    bottle if they wanted?

7    A.    Yes.

8    Q.    Okay.  Was anything else of note found in

9    Ms. Sellers' apartment or townhome?

10   A.    A loaded gun was found in the laundry room inside of

11   a white wicker basket hamper.

12   Q.    Where is the laundry room?

13   A.    Right outside the bedroom just adjacent to her

14   bedroom.

15   Q.    Okay.  Could you describe the laundry room for us.

16   A.    Female clothing on the floor.  There was a white

17   hamper that had a black backpack on the inside, the zipper

18   was closed, and on the inside was a loaded handgun with an

19   additional magazine.

20   Q.    What type of handgun was it?

21   A.    It was a Glock 30, 45-caliber handgun.

22   Q.    You mentioned it was loaded.  Did the handgun have a

23   round -- was a round chambered?

24   A.    There was a round chambered.

25   Q.    And how do you chamber a round for a Glock 30?

1   A.     You have to physically pull the slide back.

2   Q.     Okay.  Was the handgun secured in any way?

3   A.     No.

4   Q.     Was it locked?

5   A.     No.

6   Q.     I'll go ahead and show you one more document.  Agent

7   Dunn [inaudible] --

8   A.     It's the black backpack.

9   Q.     Is that the handgun actually in the backpack?

10  A.     Yes.

11  Q.     And is this the same handgun that was found in Ms.

12  Dunn's laundry room?

13  A.     Ms. Sellers' laundry room, yes.

14  Q.     Excuse me, Ms. Sellers' laundry room.

15  A.     Yes.

16  Q.     And was there --

17          MR. DeGENOVA:  Well, let me go ahead -- I'll

18  move to admit Government's Exhibit Number 6.

19          MR. ROMAN:  No objection.

20          THE COURT:  It's admitted.

21  BY MR. DEGENOVA:

22  Q.     Last question, Agent Dunn.  Was there a safety

23  mechanism engaged on the handgun?

24  A.     Glocks do not have safety mechanisms.

25          MR. DeGENOVA:  Okay.  Thank you.  No further

1    questions at this time.

2              THE COURT:  All right.  Mr. Roman, you may

3    cross-examine.

4              MR. ROMAN:  Yes, sir.

5                        CROSS-EXAMINATION

6    BY MR. ROMAN:

7    Q.    Good morning.

8    A.    Good morning.

9    Q.    So you indicated that you were involved in this

10   investigation from the beginning?

11   A.    Not from the very beginning.  I was -- I got

12   involved once the buy was set up.

13   Q.    Okay.  So you're not aware of what happened before?

14   A.    I am not.

15   Q.    Okay.  You're not aware of the conversations, you're

16   not aware of any of the evidence before that point?

17   A.    No.

18   Q.    Were you aware that the CI had a prior relationship

19   with Ms. Sellers?

20   A.    I was told that, yes.

21   Q.    And what were you told about the extent of that

22   relationship?

23   A.    Just that there was a sexual relationship between

24   the two.

25   Q.    Okay.  And were you told that there were multiple

1  calls made to Ms. Sellers from that CI?

2  A.    I don't know.

3  Q.    Okay.  And were you told that originally Ms. Sellers

4  rejected the multiple requests for the pain pills?

5  A.    I'm not aware of that.

6  Q.    And the CI's actually a convicted felon; is that

7  correct?

8  A.    I'm not aware.

9  Q.    He was actually on a probation violation; correct?

10  A.    I'm not aware.

11  Q.    Okay.  Had you ever heard of Ms. Sellers before you

12  were involved in this case?

13  A.    No.

14  Q.    You hear a lot about people selling and buying way

15  prior to their arrest; correct?

16  A.    Sure.

17  Q.    But not in this case?

18  A.    I was not a part of the entire investigation.  Like

19  I said, I stepped in and took part once the buy was

20  conducted.

21  Q.    I guess my question was - any other investigations

22  regarding Ms. Sellers regarding other --

23  A.    I didn't do it personally.

24  Q.    No.  My question is -- you're on the task force;

25  correct?

1  A.    Correct.

2  Q.    All right.  So are there any other investigations

3  that you're aware of prior to getting involved with this

4  case involving Ms. Sellers?

5  A.    Not that I'm aware of, no.

6  Q.    Thank you.

7        And were you present when the search warrant was

8  executed?

9  A.    Not while the search was -- not while it was

10  executed.  After the clan lab did the search warrant.

11  Q.    Who was present?

12  A.    I don't have a list of the names.

13  Q.    You don't have any idea who was present at the

14  search warrant?

15  A.    The DEA clan lab team executed the search warrant.

16  Q.    Was Mr.  --

17        MR. ROMAN:  Sorry, the last name?

18        MR. DeGENOVA:  Clutter.

19        MR. ROMAN:  Clutter, excuse me.

20  BY MR. ROMAN:

21  Q.    Was Mr. Clutter present?

22  A.    After the clan lab executed the search warrant.

23  Q.    Okay.  So there's nobody here in this court that was

24  present at the time of the search warrant?

25  A.    Correct.

SHEREZAD DUNN - CROSS-EXAMINATION - MR. ROMAN

1  Q.    All right.  Did you overhear anybody discuss how

2  Ms. Sellers cooperated completely with the agents as they

3  came in?

4  A.    Yes.

5  Q.    And did they indicate to you what that cooperation

6  was?

7  A.    I'm not aware of the full details, but I am aware

8  that she did cooperate.

9  Q.    Okay.  And she told them where the actual drugs

10  were; correct?

11  A.    Yes.

12  Q.    She told them where the $1400 was; correct?

13  A.    I'm not sure about that part.

14  Q.    And she told them where the gun was; correct?

15  A.    I'm not aware if she did or not.

16        MR. ROMAN:  Okay.  I have nothing further,

17  Judge.

18        THE COURT:  All right.  Any redirect, Mr.

19  DeGenova?

20        MR. ROMAN:  I forgot to add one thing.

21  BY MR. ROMAN:

22  Q.    The question was asked earlier about the carry and

23  conceal license.

24        MR. ROMAN:  If I could approach to ask if this

25  is --

SHEREZAD DUNN - REDIRECT EXAMINATION - MR. DeGENOVA          23

1      THE COURT:  You may.

2  BY MR. ROMAN:

3  Q.     [Inaudible.]

4  A.     I didn't see it, but that does appear to be

5  Ms. Sellers' [inaudible].

6      THE COURT:  All right.  Any questions?

7      MR. DeGENOVA:  A few brief questions, Your

8  Honor.

9                  REDIRECT EXAMINATION

10  BY MR. DEGENOVA:

11  Q.     Agent Dunn, when agents executed the search warrant

12  did they also find any of the government funds that were

13  previously given to the CS?

14  A.     Yes.

15  Q.     Okay.  Do you know how much was found?

16  A.     Approximately 1400.

17  Q.     Okay.  Where was that money; do you know?

18  A.     I don't recall where the money was.

19  Q.     Okay.  When Ms. Sellers cooperated with agents after

20  her arrest did she acknowledge that she was selling

21  fentanyl?

22  A.     Yes.

23  Q.     Specifically she acknowledged fentanyl, selling

24  fentanyl?

25  A.     Yes.

1   Q.    Okay.  And did she also acknowledge any other drug

2   use to agents?

3   A.    Not that I'm aware of.

4           MR. DeGENOVA:  Okay.  No further questions, Your

5   Honor.

6           THE COURT:  All right.  Agent Dunn, you may step

7   down.

8           MR. ROMAN:  One followup to what he just asked.

9           THE COURT:  Briefly, yes, sir.

10          MR. ROMAN:  Thank you.

11                    RECROSS-EXAMINATION

12  BY MR. ROMAN:

13  Q.    Were you present when she was given her *Miranda*

14  warnings?

15  A.    I was not present on scene, but I was advised that

16  she was.

17  Q.    Okay.  And was there a signed document to that

18  effect?

19  A.    I'm not sure.  I'm not aware.

20  Q.    Okay.  Did she indicate to you that she had any

21  questions regarding whether she understood *Miranda* or

22  whether she should talk or not?

23  A.    I wasn't present there.

24          MR. ROMAN:  Okay.  No further questions.

25          THE COURT:  All right.  Agent Dunn, you may step

1   down.

2            Any other evidence to present, Mr. DeGenova?

3            MR. DeGENOVA:  No, Your Honor.

4            THE COURT:  All right.  Do you have any evidence

5   you want to present, Mr. Roman?

6            MR. ROMAN:  I'd like to call Agent Clutter.

7            THE CLERK:  Please raise your right hand.

8                 [the witness was sworn]

9            THE CLERK:  Please be seated and state and spell

10  your name for the record.

11           THE WITNESS:  My first name is Justin,

12  J-U-S-T-I-N.  My last name is Clutter, C-L-U-T-T-E-R.

13           THE COURT:  You may proceed.

14                      DIRECT EXAMINATION

15  BY MR. ROMAN:

16  Q.    Mr. Clutter, thank you.  So I'd like to ask the same

17  questions to you as I did earlier.  At what point did you

18  become involved in this investigation?

19  A.    I became involved when the CS had notified me about

20  the fentanyl pills which were being sold by Ms. Sellers.

21  Q.    So you were working with the CS from the beginning?

22  A.    I had worked with the CS in the past.  I hadn't

23  worked with him for probably a period of about a year

24  until he contacted me again.

25  Q.    Okay.  And he was a convicted felon?

1  A.     Yes.

2  Q.     And he was on a violation of probation?

3  A.     He was on a probation at the time.

4  Q.     Okay.  And were you present when the phone calls

5  were made repeatedly to Ms. Sellers?

6  A.     I was present when one phone call was made.

7  Q.     One phone call.  Did he ever indicate to you that

8  she originally told him that she doesn't get involved with

9  that and she doesn't have any idea where to get substances

10 like that?

11 A.     No, he never made any indication that that

12 conversation took place.

13 Q.     And what agents were present during those

14 conversations?

15 A.     It was myself, it would have been agents -- Group

16 Supervisor Chris Gale, as well as TFO Lamar Dyar.

17 Q.     TFO --

18 A.     Lamar, L-A-M-A-R.  D-Y-A-R, I believe.

19 Q.     And they were present at every single phone call?

20 A.     We made - we made one phone call which was recorded.

21 Q.     You're telling me you made one phone call?

22 A.     Right.  The other conversation for that deal took

23 place over text message.

24 Q.     Okay.  And were you aware that there were calls made

25 when you weren't present and they weren't being recorded?

1  A.    No, because the CS actually was outfitted with an

2  audio monitor and no indication was made that a phone call

3  was made after that.

4  Q.    How do you know that?

5  A.    Because we didn't hear any over the audio-monitoring

6  device.

7  Q.    What if he had another cell phone?

8  A.    Well, it would have picked up him calling somebody

9  or communicating with somebody.

10 Q.    With a different number?

11 A.    Well, it wouldn't matter.  If the audio-monitoring

12 was on prior to the deal we would have picked up

13 communication.

14 Q.    Okay.  So you had all audio monitors for

15 Ms. Sellers' phone?

16 A.    No.  It was outfitted on the CS prior to the deal.

17 Q.    That's what I'm saying.  So what prevented the CS

18 from having another cell phone and making his own

19 individual calls?

20 A.    Right.  So if the audio-monitoring is on and he has

21 another phone we would have been able to pick up a

22 conversation from his other device.

23 Q.    What if he turned the other device off?

24 A.    I believe we would have been notified of that, that

25 there was no communication on the audio-monitoring device.

1  Q.    Okay.  Are you familiar with the prior relationship

2  the CI had with Ms. Sellers?

3  A.    Yes.

4  Q.    Okay.  How long ago did they meet?

5  A.    I believe he said several months prior he was

6  introduced to Ms. Sellers.

7  Q.    Did he indicate that he actually dated her?

8  A.    He indicated to me that he did have a sexual

9  relationship with Ms. Sellers.

10  Q.    Okay.  And did he indicate at any time that she told

11  him specifically that she wasn't interested in selling him

12  anything?

13  A.    No.  He notified me contrary to that that she had

14  actually come to him and wanted him to assist her in that

15  because she knew of his past.

16  Q.    Let's get back to the actual search warrant.  Were

17  you present when the search warrant was executed?

18  A.    I was present after the search warrant was initially

19  executed.

20  Q.    Okay.  And just to confirm what the other agent had

21  said, it was made known to you that she, in fact,

22  cooperated?

23  A.    Yes.

24  Q.    And she told them about the pills that were in the

25  container?

1  A.     Correct.

2  Q.     The gun that was in the laundry room?

3  A.     Correct.

4  Q.     And she told them the location of the $1400?

5  A.     I'm not sure about the money.  I don't remember

6  hearing that she said where the money was.  That is

7  possible, though.

8  Q.     Okay.  And were you present with her when she was

9  given her *Miranda* warnings?

10 A.     I was not.

11 Q.     Who was?

12 A.     It would have been Group Supervisor Christopher Gale

13 and Agent --

14 Q.     Lamar Dyar?

15 A.     No.  It would have been Agent Aaron Holder.

16 Q.     And I'm going to ask the same question I asked

17 before.  Were you aware of Ms. Sellers before this

18 particular sale?

19 A.     No.

20 Q.     Had you ever heard her name on your radar?

21 A.     No.

22         MR. ROMAN:  Okay.  Thank you.

23         THE COURT:  Do you have any questions, Mr.

24 DeGenova?

25         MR. DeGENOVA:  Just one.  I just want to clarify

1  one point.

2                    CROSS-EXAMINATION

3  BY MR. DEGENOVA:

4  Q.     Investigator Clutter, you mentioned that when Ms.

5  Sellers cooperated, I think Mr. Roman asked you if she

6  stated where the firearms were in the apartment; is that

7  correct?

8  A.     Yes.

9  Q.     Okay.  Where did she say it was located?

10 A.     She said it was in the laundry room.

11             MR. DeGENOVA:  Okay.  Thank you.

12             No further questions, Your Honor.

13             THE COURT:  Agent Clutter, you may step down.

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  Mr. Roman, do you have any other

16 evidence you want to present?

17             MR. ROMAN:  No, Judge.  Just proffer and

18 argument.

19             THE COURT:  All right.  Do you want to be heard

20 on the issue of probable cause with respect to preliminary

21 hearing?

22             MR. DeGENOVA:  No, we'll submit.

23             THE COURT:  All right.  So the evidence

24 establishes probable cause to believe that Ms. Sellers has

25 violated Title 21, United States Code, Section 841, as

1    alleged in the criminal complaint.

2          We're now on the issue of detention.  Mr.

3    DeGenova, let me hear the government's position on

4    detention of Ms. Sellers.

5          MR. DeGENOVA:  Yes, Your Honor.

6          Your Honor, it's the government's position that

7    no condition or combination of conditions of release can

8    ensure that Ms. Sellers will not be a danger to either her

9    children or to the community at large.

10          Ms. Sellers was found in possession of these

11    fentanyl pills in her home.  She also sold 100 fentanyl

12    pills to the CS.  She herself admitted to the strength of

13    these pills, she knew that they were strong.  She was

14    advising people who were purchasing the pills to cut them

15    into quarters.  As Agent Dunn testified, that would have

16    been approximately 400 doses of the fentanyl pills that

17    were sold to the CS and another 400 pills that were found

18    in her home.

19          The pills were found in a Rite-Aid lysine

20    bottle.  Lysine, I'll proffer to the Court, is just a

21    nutritional supplement or a dietary supplement.  The pills

22    were not secured in any manner and it would have been easy

23    for anyone to get a hold of those pills and mistakenly

24    take one of them.

25          I think Agent Dunn -- excuse me, Agent Dunn did

1  briefly mention the potency of fentanyl and -- I mean,

2  I'll proffer again that fentanyl, in many forms, is many

3  times more potent than morphine or other drugs.  It's

4  significantly more lethal than other drugs that we see on

5  the streets such as heroin.  Ms. Sellers knew that the

6  pills contained this substance, she admitted so to the CS,

7  and she admitted it again to agents when they arrested

8  her.

9         Not only was Agent Dunn -- or excuse me.  Not

10  only did Agent Dunn testify to this, but Ms. Sellers was

11  selling these items out of her home.  She sold the pills

12  to the CS out of her own residence where her children were

13  at and at that residence was a loaded firearm.  The

14  firearm was upstairs close to her bedroom and Agent Dunn

15  testified it was loaded, that's a conscious decision to

16  put a round in the chamber of the handgun, there was

17  another magazine with it, the firearm was not secured and

18  it's a reasonable inference that the gun was there to

19  protect Ms. Sellers and to protect her drug business.

20         And then last I'll mention that Ms. Sellers has

21  cooperated, but there's some issues, I think, with her

22  credibility.  She's tried to minimize her conduct with

23  respect to drug use.  On her person was found personal use

24  methamphetamines, marijuana, and some of the same fentanyl

25  pills that were sold to the CS -- or appeared to be the

1 same that was sold to the CS and that were found in her

2 home.

3         She said there were no guns at the house.  She

4 told pretrial services there were no guns, but she did

5 admit that to agents.  And she has a concealed carry

6 permit, and I think it's a reasonable inference to say

7 that that was Ms. Sellers' gun and she possessed it to

8 protect herself and protect her drugs.

9         For those reasons, it's the government's

10 position that there's no combination of conditions that

11 would ensure the safety of her children or any other

12 member of the community, for that matter.  These are

13 really dangerous pills and Ms. Sellers knew that.

14         THE COURT:  Is the government invoking the

15 rebuttable presumption that she should be detained?

16         MR. DeGENOVA:  Yes, Your Honor, the government

17 is.

18         THE COURT:  All right.  Thank you, Mr. DeGenova.

19         Mr. Roman.

20         MR. ROMAN:  Yes, sir.

21         Just a background on Ms. Sellers.  She is 38

22 years old.  She has two children that she lives with at

23 her home.  She's a 17-year native of Georgia.  She doesn't

24 even have a passport, she's never even left the country.

25         Present in the courtroom is her mother, Diane

1   Cosby, and the father of her children, Mr. Michael

2   Sellers.   Unfortunately her father couldn't be here.   He

3   had some issues and he's in the hospital in Atlanta now,

4   but he would have liked to be here.   So she has

5   significant ties to this community, that I believe the

6   government has introduced no evidence whatsoever that she

7   is a flight risk.

8           She cooperated on the case, Judge.   She told

9   them where everything was in the house.   The government's

10  characterization that this was a drug enterprise is a

11  leap.   She's not been on either of these agents' radar at

12  all ever in her life.   She has no prior felony convictions

13  whatsoever.

14          Your Honor, it might be the government's

15  standard position to just, you know, ask for detention on

16  all these cases, but I'd ask that you look at this a

17  little bit more traditionally.   Her children alone would

18  be a reason for her not to flee, she's very close to her

19  children.

20          We're going to sort through the facts of this

21  case, but at the end of the day, it is 200 pills, it's not

22  200,000 or all the things that you see in this court.   The

23  gun in the house, she has a carry and conceal.   She's had

24  incidents in the past.   I'm not sure what good cause a gun

25  would have if it's unloaded, I'm not sure how that would

1  work at 4:00 o'clock in the morning.  But I know I have a

2  loaded gun at my house and there's a chamber in the round

3  in case I wake up groggy and somebody's attempting to

4  break in my door, that gun needs to be ready, and she has

5  the two children and she's had issues at the house before

6  with other prior men and that was there to protect

7  herself, not protect her drug enterprise.  This is not an

8  enterprise, Your Honor.  This was a sale and a recent

9  possession.  This is not something that she's done in the

10  past so there's no indication that she's going to do this

11  in the future.

12        So I would ask that you go along with the

13  pretrial's recommendation of a $20,000 bond on this case

14  and any other factors which you consider might be

15  important, but she does want to get back out there and

16  work.  She does currently work in some interior design.

17  She has two current projects going on.  If you feel maybe

18  a curfew would assure that she's home at a certain hour,

19  we would certainly be amenable to that and any other

20  considerations that you have.

21        THE COURT:  Mr. Roman, let me just address with

22  you concerns from the pretrial services report and what's

23  been argued here is that -- I don't think they're arguing

24  flight.  I think they're arguing danger to the community

25  is my understanding.  Specifically, the danger this posed

1  by her distributing a very potent drug -- we can look at

2  the newspaper and see consequences it has on putting a

3  poison like this out indiscriminately.  And she said in

4  her pretrial service report interview that she did not

5  have a firearm.

6            MR. ROMAN:  If I could address that.

7            THE COURT:  Yeah, I'd like for you to address

8  that.

9            MR. ROMAN:  She asked - "Do you currently have

10 firearms at your house?"  She said, "No, they took the

11 gun."  That was the question.  The question was after her

12 arrest.

13           THE COURT:  Is the probation officer in the

14 courtroom?

15           PROBATION OFFICER:  Yes, sir.  She did not let

16 me know that they had taken a gun.  I didn't know anything

17 about the gun until 5 minutes before court.

18           MR. ROMAN:  Right.  But the question as she

19 understood was - "Is there any guns in your house?" and

20 she said no.  And they didn't find any other guns or

21 anything else.

22           THE COURT:  Okay.  All right.  Thank you.

23           I'm going to grant the government's motion for

24 detention as to Ms. Sellers.  Ms. Sellers was in

25 possession of a large quantity of highly potent drugs, not

1  in a secured fashion, in a bottle that doesn't appear to
2  have any safety control on it, she had a loaded firearm
3  that is typically associated -- it can be associated
4  certainly for safety, but in the case with drug dealers
5  the presumption is it's connected with protecting the drug
6  stash.
7          She apparently does have some history of drug
8  use that's reflected here.  In fact, she was in possession
9  of user quantity amounts in her purse that she's not
10 acknowledged.
11         The strength of the government's case is pretty
12 good here based on the evidence that's been presented to
13 me.  She did a controlled delivery, they have that.  Then
14 when they followed up with the search warrant they
15 obtained the drugs there.  There's significant evidence
16 against her in this respect.  So the presumption does
17 apply and I'm going to order that she be detained pending
18 trial on these charges.
19         Anything further for the government?  We'll be
20 in recess as to her case.
21               [proceedings concluded]
22
23
24
25

1

2   UNITED STATES DISTRICT COURT

3   NORTHERN DISTRICT OF GEORGIA

4   CERTIFICATE OF REPORTER

5

6           I do hereby certify that the foregoing pages are

7   a true and correct transcript of the proceedings taken

8   down by me in the case aforesaid.

9

10

11           This the 27th day of June, 2017.

12

13

14                   /S/ Alicia B. Bagley
                     ALICIA B. BAGLEY, RMR, CRR
15                   OFFICIAL COURT REPORTER
                     (706) 378-4017
16

17

18

19

20

21

22

23

24

25